483 A.2d 895

**COMMONWEALTH of Pennsylvania**

v.

**Vincent Anthony SANTARELLI, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**William M. GUINTHER, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**William Joseph STEINGRABER, Appellant.**

Superior Court of Pennsylvania.

Argued July 10, 1984.

Filed Oct. 26, 1984.

Petition for Allowance of Appeal Denied March 4, 1985.

590

Emmanuel H. DiMitriou, Reading, for Santarelli, appellant.

John M. Elliott and Daniel F. Ryan, III, Philadelphia, for Guinther, appellant.

Calvin Lieberman, Reading, for Steingraber, for appellant.

Charles Guthrie and Stuart Suss, Assistant District Attorneys, Reading, for Commonwealth, appellee.

Before WIEAND, OLSZEWSKI and POPOVICH:

OLSZEWSKI, Judge:

This appeal follows each man's convictions on counts of possession of a Schedule I controlled substance, to wit, marijuana,[1] possession with intent to deliver,[2] and criminal conspiracy.[3] The cases were consolidated for trial and again for appeal. We address in turn the claims of each appellant.

1. 35 Pa.C.S. § 780–113(a)(16).
2. 35 Pa.C.S. § 780–113(a)(30).
3. 18 Pa.C.S. § 903(a)(1).

*William A. Guinther*

Guinther argues: (1) insufficient evidence introduced by the Commonwealth against Guinther mandates reversal and discharge; (2) the trial court erred by refusing to instruct the jury on the offense of possession of less than 30 grams of marijuana; and (3) prosecutorial misconduct during closing argument mandates reversal. Guinther's argument concerning the sufficiency of the evidence is developed for the first time on appeal.

Guinther's trial counsel raised the issue of sufficiency of the evidence in post-verdict motions. He failed, however, to develop the issue in his post-trial brief. Finding that Guinther had waived the issue, the trial court refused to reach the merits of the argument. Lower ct. op. at 2 n. 3.

On appeal, Guinther by his new counsel argues that failure to brief the issue constitutes ineffective assistance of counsel. Ineffective assistance will be found where counsel without reason neglects a claim of arguable merit. *Commonwealth v. Upsher*, 497 Pa. 621, 626–627, 444 A.2d 90, 92 (1982); *Commonwealth v. Knox*, 304 Pa.Super. 368, 373, 450 A.2d 725, 727 (1982). To reach the issue of ineffective assistance we must first address the foregone claim, the sufficiency of the evidence.

Appellant asserts that the evidence introduced by the Commonwealth against him is insufficient in law to prove beyond a reasonable doubt all the elements of the crimes with which he was charged. We disagree.

In assessing the sufficiency of the evidence on appeal, the standard is well-settled. We must ask whether, accepting as true, all the evidence and all reasonable inferences deductible from such evidence upon which the trier of fact could have based his verdict, the evidence and the inferences are sufficient in law to prove guilt beyond a reasonable doubt. *Commonwealth v. Williams*, 468 Pa. 357, 365, 362 A.2d 244, 248 (1976). Moreover, in reviewing the evidence, we must consider it in the light most favorable

to the Commonwealth. *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 348, 353 A.2d 387, 389 (1976).

■ After carefully reviewing the record, we are satisfied to adopt the statement of facts set forth in the lower court opinion.

In November, 1980 Wendell Mihalak was employed by the Federal Aviation Administration (FAA) as an air traffic controller at the Reading Airport in Reading, Pennsylvania and had been so employed for approximately twelve years. Mihalak knew defendant Guinther through several parties given by Mihalak's boss and attended by both Mihalak and Guinther, through Guinther's association with the American Bonanza Society which is a flying organization having an office building at the Reading Airport, and also through Guinther's status as a flight instructor, and had spoken with Guinther over the radio about a thousand times during the preceding seven or eight years. Because of his familiarity with Guinther's voice, Mihalak recognized it when a man piloting a twin-engine Baron 6729 Tango called him for take-off taxi instructions on November 10, 1980 at 5:00 a.m. while Mihalak was on duty at the Reading Airport. In response to Mihalak's query, Guinther informed Mihalak that he was headed for West Palm Beach, Florida, and engaged in further conversation with Mihalak regarding tail winds before taking off.

On November 11, 1980 Raymond Gillman was employed by the FAA and was working as an air traffic control specialist at the Vero Beach Airport's flight service station in Vero Beach, Florida. After receiving a telephone call that evening Gillman observed an aircraft taxiing into the parking ramp area at the Vero Beach Airport at approximately 8:15 p.m. From his vantage point approximately two hundred feet from where the aircraft was parked in a well-lit area, and with the inermittent aid of binoculars, Gillman noticed that the aircraft bore the numbers N6729T and that it appeared to be carrying several large brown boxes in the cabin area behind the pilot and co-pilot's seats. Gillman also saw one individual get out of the aircraft,

which individual was a man who appeared to be in his fifties, wore a suit and tie, and walked with a very pronounced limp. Shortly after exiting the aircraft this man entered the flight service station, where he was observed by Gillman from a distance of twenty-five feet. Gillman identified the individual who got out of the aircraft N6729T as being the defendant William Guinther. Approximately one-half hour after he first saw the aircraft N6729T, Gillman observed it taxiing out and away from the parking ramp, and then it disappeared from his view.

On the evening of November 11, 1980 Officer Andrew Bradley of the Vero Beach Police Department received a telephone call, and as a result of that call, went in his police vehicle to the Vero Beach Airport for the purpose of stopping a plane. Once out on the taxiway Officer Bradley observed an aircraft bearing the numbers N6729T taxiing out towards the main runway. He approached the plane from the front, passed it on its right side, keeping pace with it as it continued to taxi. Officer Bradley turned on his police unit's siren and flashing blue lights as he initially approached the aircraft, and kept them on as he traveled alongside it. Bradley also aimed his spotlight into the cockpit, and was able to see the pilot's face as the pilot turned towards the light. Bradley described the pilot as a man in his early mid-fifties, with graying hair and dark-rimmed, clear-lensed glasses, and identified him as the defendant William Guinther. Bradley kept his spotlight on and pointed at the cockpit as he paralleled the plane, traveling three or four feet off the right wing tip at a speed of ten to fifteen miles per hour for a distance of two hundred and fifty to three hundred yards. He observed what he believed to be luggage behind the pilot's seat and an umbrella handle in the cockpit. He also obtained a second look at the pilot's face when the pilot again turned to look at Bradley's police vehicle. As the aircraft and Bradley's vehicle reached the end of the taxiway, the former turned onto the main runway, and Bradley cut across a strip of grass in an attempt to get in front of the plane. He was

successful in his attempt, but was obliged to move out of the way in order to avoid being hit by the aircraft. The plane then took off over the roof of a second police vehicle which had been dispatched to Officer Bradley's aid.

At 3:00 a.m. on November 12, 1980 Wendell Mihalak, while on duty at the Reading Airport, received a radio call from a pilot then flying over nearby Ephrata, Pennsylvania, and Mihalak recognized his voice as being that of the defendant, William Guinther. Using the call sign November 9488 Sierra, the pilot requested landing instructions, which Mihalak supplied. Following Mihalak's instructions, the pilot landed and taxied over to the west part of the ramp near the American Bonanza Society building, and Mihalak observed an individual exit the aircraft, walk over to the Bonanza Building, and turn on a light. Two or three minutes later Mihalak saw a pickup truck without a cap or camper on the back leave the area, and five minutes after that Mihalak saw it return. Shortly thereafter Mihalak noticed a large blue pickup truck with a white cap or camper coming up a road next to the Bonanza building. After stopping at a gate, this second truck drove up to the aircraft, approaching it from the front, and pulled next to the plane's right side, remaining there for five or ten minutes before leaving via the same road it had arrived. In the half hour immediately preceding the landing of the above-mentioned aircraft, no other planes landed at the Reading Airport, and in the half hour immediately thereafter, only one plane, a United States Customs aircraft, landed.

On November 11 and 12, 1980 George Kontrabecki was a pilot and law enforcement officer employed by United States Customs and stationed in Jacksonville, Florida. On the evening of November 11 Kontrabecki took off from Jacksonville in a Customs aircraft for the purpose of pursuing another plane, and was accompanied on this flight by Houston Allman, a Customs Air Officer who rode in the rear of the Customs aircraft. After landing his plane in Baltimore to refuel, Kontrabecki continued on to the Read-

ing Airport, where he landed at approximately 3:30 a.m. on November 12. Mihalak then directed Kontrabecki over to the western part of the ramp near the Bonanza Building, and as Kontrabecki was taxiing in that direction he observed a twin-engine aircraft bearing the numbers N6729T parked in front of the building and a bluish or greenish pickup truck with a white camper shell backed up at an angle to the aircraft's right side. By the time Kontrabecki reached the ramp this pickup truck became mobile, proceeding towards the west gate without its lights on. Kontrabecki followed the truck in his plane to the vicinity of the west gate, where the truck's lights were turned on. The truck then proceeded through the gate and down a hill out of Kontrabecki's sight.

At approximately 3:30 a.m. on November 12, 1980 State Troopers Leon Huey and Louis Belsterling proceeded to the Reading Airport in a patrol car, traveling north on Route 183. After passing the front entrance to the airport, Trooper Huey, who was driving, made a right hand onto a service road leading to the west gate, whereupon both Huey and Belsterling observed a set of headlights coming towards them from the vicinity of the west gate. Both officers watched these headlights proceeding down the road towards their patrol car, and within a few seconds of stopping their vehicle at the first intersection, were able to observe the source of the headlights, i.e., a bluish-green pickup truck with a white or light cap or camper which also arrived at the same intersection and stopped. The pickup truck then made a lefthand turn at the intersection and followed the truck. Huey continued to follow the truck as it turned left onto Route 183, whereupon Huey made a U-turn in the intersection and followed the truck. Huey continued to follow the truck as it turned left onto Route 183, and was able to observe several square-shaped packages in the rear portion of the truck inside the camper. As the truck neared the main entrance of the airport on Route 183 Huey turned the patrol vehicle's red lights on, and the pickup truck pulled over. Using his public address system, Huey told

the occupants to get out of their vehicle and proceed to the rear of the truck, which they did. Both Huey and Belsterling identified the truck's occupants as defendants William Steingraber and Vincent Santarelli, the former having exited the vehicle from the driver's side and the latter from the passenger's side. The police then instructed the occupants to get back into their vehicle and return to the area from which they had just come, whereupon both reentered the truck and, followed by Huey and Belsterling, proceeded back up the service road and stopped a few feet from the west gate.

Three or four minutes after Customs Officer George Kontrabecki lost sight of the pickup truck which he initially saw parked near the aircraft N6729T he observed a pickup truck fitting the same description coming back up the hill towards the west gate, followed by a marked State Police vehicle. Customs Officer Houston Allman, while standing near the gate, saw the two men who got out of the pickup truck, and testified that they were Santarelli and Steingraber. Kontrabecki also saw two men in the vicinity of the pickup truck, and identified them as defendants Steingraber and Santarelli. Allman looked into the rear of the pickup truck from the outside and saw numerous packages enclosed in brown paper or boxes, at least some of which were torn in places, and through these tears was able to see a substance protruding which appeared to him to be marijuana. Allman then opened the rear door of the truck and being satisfied that the substance was marijuana, he walked over to the men who had been in the pickup truck and read them their rights. Kontrabecki also looked into the back of the truck and saw what appeared to be marijuana in a number of torn packages, and subsequently observed, from the outside of the aircraft with the aid of a flashlight, a small amount of vegetable matter or debris resembling marijuana on the floor inside the aircraft N6729T. In addition, Kontrabecki tried the handles on the passenger and cargo doors of the aircraft N6729T, and found that he was able to open them.

On November 12, 1980 Corporal Gary Stiver of the Pennsylvania State Police took rolled ink impressions of all ten of defendant Guinther's fingerprints, and transferred them to a fingerprint card (Exhibit 2). Corporal Roman Petrosky, also of the Pennsylvania State Police, testified that six latent fingerprints lifted from inside the aircraft N6729T matched the various fingerprints on Exhibit 2 [the fingerprint card], and stated that in his opinion, the prints found inside the plane and those on Exhibit 2 were made by the same person. Paul Skrimcovksy, a criminalist with the Pennsylvania State Police, tested the debris (Exhibit 12) found inside the aircraft N6729T, and the eleven packages (Exhibit 10) removed from the pickup truck, and found that all contained marijuana and that the eleven packages had a combined net weight of 343.6 pounds. Trooper Ronald Haberstroh, a fourteen year member of the Pennsylvania State Police Troop L vice unit, testified that in his opinion, possession of 343.6 pounds of marijuana is not consistent with personal use.

Lower ct. op. at 9–10. Further, we agree with the Honorable Richard Eshelman that:

The above-recited evidence, particularly that relating to defendant Guinther's taking off from Reading to Florida in aircraft N6729T, his presence the following day at Vero Beach, Florida in aircraft N6729T, which carried what one witness described as large brown boxes, his evasion of Vero Beach police, his use of the incorrect call sign 9488 Sierra when landing in Reading, the presence of the pickup truck shortly thereafter next to aircraft N6729T for five or ten minutes, the observation by Kontrabecki of the pickup truck proceeding without headlights from the aircraft to the west gate of the airport, the observation by state police officers of the pickup proceeding from the west gate onto Route 183 loaded with packages, which truck was occupied by Steingraber and Santarelli and which packages contained 343.6 pounds of marijuana, the presence of marijuana residue and Guinther's fingerprints in aircraft N6729T, and the fact that possession of 343.6 pounds of marijuana is not consistent

with personal use of such substance, was more than sufficient evidence to allow the jury to conclude that Guinther transported 343.6 pounds of marijuana from Vero Beach to Reading in aircraft N6729T, that as pilot Guinther had both the power and intent to control the marijuana, that the marijuana was transferred from his plane to the pickup truck by Steingraber and Santarelli and transported in the truck occupied by them, that the latter two defendants had the power and intent to control the contraband while it was transferred to and located and transported in the truck, and that all of the above was done pursuant to an agreement among the three defendants to accomplish the same. Having drawn the above conclusions, the jury could properly find the defendants guilty of possession of the controlled substance, marijuana, possession with intent to deliver it, and conspiracy to commit these crimes.

Lower ct. op. at 9–10.

 Guinther relies on three out-of-state cases to support his argument. *Dubry v. State*, 582 S.W.2d 841 (Tex. Crim.App.1979); *U.S. v. Burgos*, 579 F.2d 747 (2d Cir.1978); and *Waldon v. State*, 579 S.W.2d 499 (Tex.Crim.App.1979). We receive these decisions as persuasive authority but not binding precedent. *See Commonwealth v. National Bank & Trust Co. of Central Pennsylvania*, 469 Pa. 188, 364 A.2d 1331 (1976). The two Texas cases stand for the proposition that conviction under a "constructive possession" theory requires proof of an affirmative link between the accused and the contraband. *See Willis v. State*, 636 S.W.2d 602, 605 (Tex.App.1982). In *Willis*, the court found the requisite link in evidence of proximity and control. That same link exists in this case in proof that Guinther piloted the plane from Vero Beach to Reading.[4] Similarly, *Burgos* supports the proposition that mere presence is not enough. We agree. In the instant case, however, evidence

---

4. The court in *Dubry* suggested that the facts of the case would support a conviction for conspiracy. 582 S.W.2d at 844. However, the criminal conspiracy sections of the Texas Penal Code did not apply to violations of the Controlled Substances Act. *Id.; cf. Commonwealth v. Davenport*, 307 Pa.Super. 102, 452 A.2d 1058 (1982) (affirming convictions for criminal conspiracy and unlawful delivery of a controlled substance.)

that Guinther had flown the plane from Vero Beach must be considered with the fact of his flight from Florida authorities, the presence of marijuana on the floor of the plane, the discovery of the 343.6 pounds of marijuana and the attendant circumstances. A review of the record below leads us to the conclusion that the facts presented at trial by the Commonwealth were such that a jury could find beyond a reasonable doubt that Guinther committed the crime charged against him.

Finding the omitted claim meritless, we do not reach the second prong of the test—whether the course chosen by counsel had some reasonable basis designed to effectuate the interests of the client. *See Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967).

 Judge Eshelman's able opinion has resolved Issues 2 and 3. We note that Guinther's second argument fails on its own terms. The doctrine of lesser—included offenses evolved at common law to prevent the prosecution from failing where some element of the crime charged was not made out. "There is no duty on a trial judge to charge upon law which has no applicability to presented facts." *Commonwealth v. Wilds*, 240 Pa.Super. 278, 279, 362 A.2d 273, 278 (1976). In *Wilds*, police had searched the defendant and his home. They seized approximately 4 pounds from defendant's home but less than 30 grams from his person. On appeal, this Court looked to three factors, the quantity of marijuana seized, the disparate penalties for the various offenses, and the apparent jury confusion over the charge. We reversed on the trial court's refusal to charge the jury on possession of less than 30 grams of marijuana. In the instant case, the .0025 ounces of marijuana represents the residue scraped from the floor of airplane found at 3:30 in the morning in the vicinity of a truck carrying 343 pounds of marijuana. On the facts, we find Guinther's argument somewhat less than compelling.

Judgment of sentence affirmed.

*Vincent A. Santarelli*

 Santarelli charges: (1) failure to suppress illegally seized contraband introduced by the Commonwealth against Santarelli, (2) failure to grant a change of venue or other relief necessary to ensure a fair trial, (3) insufficient evidence introduced by the Commonwealth against Santarelli, (4) improper closing argument by the Assistant District Attorney; and (5) failure to instruct the jury in accordance with the defendant's points for charge mandate reversal. After a careful review of the record, we find Judge Eshelman's opinion has disposed of Issues 1, 3, 4, and 5. We find appellant's argument on Issue 2 without merit. Disposition of a motion for a change of venue lies within the sound discretion of the trial judge. *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978). As a rule, a defendant alleging prejudicial pre-trial publicity must show actual prejudice. An exception exists where pretrial publicity is "so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue...." *Commonwealth v. Frazier*, 471 Pa. 121, 127, 369 A.3d 1224, 1227 (1977). The trial judge makes the determination based on the content of the publicity. Here Judge Eshelman, in his Disposition of Defendant's Omnibus Pretrial Motions for Relief, found the attendant publicity "contained objective, non-inflammatory reporting." Finding of Fact 40. Absent proof of actual prejudice, appellant's second claim must fall.

Judgment of sentence affirmed.

*William J. Steingraber*

 Steingraber argues: (1) the trial court erred by refusing to suppress the evidence; (2) prosecutorial misconduct during closing argument mandates reversal; (3) insufficient evidence introduced by the Commonwealth against Steingraber mandates removal (sic); (4) failure to grant a change of venue or other relief necessary to ensure a fair trial mandates a reversal; and (5) remand for resentencing of Steingraber is required where the judge did not consider factors individual to Steingraber. Judge Eshelman, in his thorough opinion, resolved Issues 1, 2 and 3. After a

careful review of the record, we adopt his reasoning. Issue 4 we have discussed *supra* as regards appellant Santarelli. The same reasoning applies here. As regards Steingraber's fifth argument, our review of the record satisfies us that Judge Eshelman did give conscientious consideration to the circumstances of the offense and the background and character of Steingraber. *See* R. 1985a–1906a and R. 1912a–1917a.

Judgment affirmed.

WIEAND, J., concurred in the result.