640 A.2d 395

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Paul David CREWS, Appellant.**

Supreme Court of Pennsylvania.

Argued May 6, 1992.

Decided April 21, 1994.

Reargument Denied May 31, 1994.

510

Steven V. Manbeck, Mifflintown, Jerry Arthur Philpott, Duncannon, for appellant.

R. Scott Cramer, Dist. Atty., Daniel Stern, Asst. Dist. Atty., for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, McDERMOTT and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY,[1] Justice.

This is an appeal pursuant to 42 Pa.C.S. § 9711(h) from a sentence of death imposed on Paul David Crews following a jury trial in which he was convicted of murdering two hikers on the Appalachian Trail in Perry County. The main issue is appellant's challenge to DNA evidence admitted against him at trial. We hold that evidence of DNA testing is admissible and that appellant has raised no other claims that merit relief.

In the morning of September 13, 1990, two hikers, Geoffrey Hood and Molly LaRue, were killed at an overnight shelter on the Appalachian Trail in Perry County. Miss LaRue had been tied, raped, and stabbed, resulting in death approximately fifteen minutes after being stabbed in the neck. Mr. Hood, her boyfriend, had been shot three times with a revolver, and died five to eight minutes after receiving the fatal shot in the lower left chest. The victims had been southbound on the trail, and on the day before they were murdered, they had been seen by other hikers and employees in several stores in Duncannon where they had purchased supplies.

A week later, appellant Paul David Crews was arrested while crossing the Potomac River from Maryland to West Virginia. He was subsequently charged with the murders.

The evidence at trial was entirely circumstantial. Witnesses testified that two days before the murders, appellant had visited a library in East Berlin, Pennsylvania, seeking a map of the Appalachian Trail and had later sought directions of others nearer the trail. Witnesses remembered that he wore black military boots and had two red duffel bags with a "Marlboro" logo. Others observed him on the trail going south after the crime. He was wearing hiking gear that had belonged to the victims. When he was apprehended, he possessed numerous articles that had belonged to the victims. A ballistics expert testified that the handgun he possessed upon his arrest was the weapon which killed Mr. Hood. He

1. This case was reassigned to this author.

also had a knife with blood on it which matched the blood type of Miss LaRue. Other witnesses identified objects found at the murder scene or along the trail south of the murders as being or resembling property of appellant.

An FBI DNA expert, Dr. Deadman, testified that appellant's DNA patterns in three of four genetic loci matched the DNA patterns obtained from semen samples from Miss LaRue's vagina. He did not state a statistical probability of such a match occurring by chance; the defense expert, Dr. Acton, criticized any conclusion reached without a statistical showing that the match was not simply coincidental.

Following jury verdicts of first degree murder, a sentencing hearing was held. A physician for the prosecution testified that there was medical evidence that Miss LaRue's hands had been tied before she was killed. The defense presented evidence that appellant had no prior convictions and the testimony of appellant's employer who described appellant's work and drinking habits. The defense also presented a psychiatrist who testified that appellant had a schizoid personality and suffered from an organic aggressive syndrome aggravated on the day of the killings by the consumption of alcohol and cocaine.

The jury was instructed that the potential aggravating circumstances pertaining to the Hood murder were that the killing occurred during the perpetration of a robbery, that there was a grave risk of death to another, and that appellant was convicted of another murder. In the LaRue murder, the aggravating circumstances submitted to the jury were that the killing occurred during the perpetration of a rape, that the killing was committed by torture, and that appellant was convicted of another murder. The mitigating circumstances submitted to the jury in both killings were: that there were no prior convictions; that appellant was under extreme mental or emotional disturbance; that appellant's capacity to appreciate or conform his conduct was substantially impaired; that he acted under extreme duress; and any other mitigating evidence concerning the character and record of appellant and the circumstances of his offenses.

The jury found all three aggravating circumstances in the LaRue murder, and two aggravating circumstances in the Hood murder: grave risk of death to another and conviction of another murder. In both murders, the jury found that aggravating circumstances outweighed any mitigating ones, and returned verdicts of death. The court immediately sentenced appellant to two consecutive death sentences. This appeal pursuant to 42 Pa.C.S. § 9711(h) followed.

Appellant raises a pretrial issue challenging the venue of the trial due to prejudicial publicity together with other issues pertaining to both the trial and penalty phases of the prosecution. We will review his claims as they arose in the proceeding: first pretrial, then trial, then penalty hearing.

We begin by examining the sufficiency of the evidence to sustain verdicts of murder of the first degree, as we do in every capital case, even when the issue is not raised by the appellant. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). The applicable standard of review is whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find every element of the crime beyond a reasonable doubt. *Commonwealth v. Zook*, 532 Pa. 79, 85, 615 A.2d 1, 4 (1992). In keeping with that standard, the evidence overwhelmingly established appellant's guilt.

Though circumstantial, the evidence wove a web tight enough to establish appellant's guilt beyond a reasonable doubt. Appellant was observed near the scene of the crimes shortly before and shortly after the killings. Property identified as appellant's was found abandoned on the trail south of the corpses, and when he was arrested further south, he had in his possession numerous items positively identified as those of the victims and was even wearing some of their clothing. Appellant had in his possession both murder weapons: the revolver and the knife which killed Mr. Hood and Miss LaRue. DNA testing established a strong probability that the semen

removed from the body of Miss LaRue was that of appellant, and the testing definitely eliminated the possibility that the semen was that of Mr. Hood or Mr. Reese, another suspect subject to investigation, who was later cleared of suspicion. The cumulative effect of this evidence, if believed by the jury, was sufficient to establish guilt beyond a reasonable doubt.

The first issue raised by appellant is his claim that the trial court erred by refusing to grant a change of venue in the face of overwhelming adverse pretrial publicity. He claims that the publicity in his case closely parallels that in the case of *Commonwealth v. Breakiron*, 524 Pa. 282, 571 A.2d 1035 (1990), *cert. denied; Breakiron v. Pennsylvania*, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990) in which this court held that the publicity was inherently prejudicial, so that the accused need not demonstrate how he was prejudiced. Appellant states that press coverage a mere two months prior to his trial characterized the events as "grisly," revealed other crimes of which appellant stood accused (though he had no other convictions), and extensively credited "official sources" for sensational reporting about appellant. He argues that a cooling-off period of only two months was not sufficient to dissipate the prejudicial effect of the publicity, in contrast to the period of "almost a year" which significantly diluted the prejudice in *Breakiron.*

The *Breakiron* court summarized the law governing a decision whether pretrial publicity requires a new trial regardless of any showing of prejudice, previously set forth in *Commonwealth v. Romeri*, 504 Pa. 124, 470 A.2d 498 (1983). If the publicity was "inherently prejudicial," and if it saturated the community, and if there was insufficient time for the community to cool down from the effects of the publicity, then a new trial is required. *Breakiron*, 524 Pa. at 287, 571 A.2d at 1037. Factors in establishing whether pretrial publicity is inherently prejudicial include:

> whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and "slanted articles demanding conviction" ...; whether the pre-trial publicity revealed the exis-

tence of the accused's prior criminal record; whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers.

*Id.*, citing *Commonwealth v. Romeri, supra.* However,

[o]nce inherently prejudicial publicity is established, our next inquiry is "whether such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it." And finally, even if there has been inherently prejudicial publicity which has saturated the community, we must also consider whether there has been a cooling-off period which would significantly dilute the prejudicial effects of the publicity.

*Id.* (Citations and footnote omitted.)

Though the publicity in this case was not so sensational and inflammatory as that described in *Breakiron,* it did include reports which were objectionable. Assuming, arguendo, that the publicity was inherently prejudicial, it cannot reasonably be said that it was "so extensive, so sustained and so pervasive" that the community was saturated with it. The three newspapers which published arguably inflammatory articles had a combined circulation of less than 6,500 papers in a county of more than 41,000 residents.

With respect to a cooling-off period, the court noted the following guidance in *Breakiron:*

In testing whether there has been a sufficient cooling period, a court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove.

Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that

would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

*Id.,* 524 Pa. at 288 n. 1, 571 A.2d at 1037–38 n. 1.

The record clearly establishes that the community enjoyed a period in which passion had a chance to cool before appellant's trial. Although appellant emphasizes that some objectionable articles appeared only two months before trial, most of the sensational news reporting occurred six to eight months earlier. The test of the cooling-off period lies in the voir dire of potential jurors. Recognizing the wide discretion of the trial court to evaluate the bias or impartiality of jurors during voir dire, the record fails to substantiate appellant's contention that pretrial publicity interfered with his opportunity to receive a fair trial by an impartial jury. The trial court's conclusion to that effect was not an abuse of discretion.

The next issue is appellant's claim that he was entitled to a *Frye* hearing to determine the admissibility of DNA test results. He also claims that the DNA opinion given by a prosecution witness was unduly prejudicial because it did not give statistical probabilities of coincidence, and he argues that it was reversible error to deny him a continuance to examine the DNA evidence.

When scientific advances produce new types of evidence, admissibility of such evidence depends on the test first laid down in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (1923):

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be

sufficiently established to have gained general acceptance in the particular field to which it belongs.

The *Frye* test was adopted by this court in *Commonwealth v. Topa*, 471 Pa. 223, 231, 369 A.2d 1277, 1281 (1977) (spectrograms had not yet become generally accepted by scientists in that field, and opinion evidence of the defendant's voiceprints was therefore inadmissible), and has been followed in *Commonwealth v. Nazarovitch*, 496 Pa. 97, 101, 436 A.2d 170, 172 (1981) (hypnosis as a forensic tool was not generally accepted by the authorities, and reliability of hypnotically-refreshed testimony was not established, so such testimony was not admissible); *Commonwealth v. Dunkle*, 529 Pa. 168, 173, 602 A.2d 830, 832 (1992) (uniformity and reliability of "child sexual abuse syndrome" was not generally accepted in the field of psychology, so it was error to permit expert testimony based on the syndrome); *Commonwealth v. Zook*, 532 Pa. at 98–100, 615 A.2d at 11–12 (analysis by electrophoresis of the enzymes in dried bloodstains is generally accepted as reliable among experts in the field of forensic serology, so expert testimony as to the enzyme testing was properly admitted).[2]

2. After the trial and after appellate argument in this case, the United States Supreme Court addressed the viability of the *Frye* test as a rule of evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Court was "called upon to determine the standard for admitting expert scientific testimony in a federal trial." *Id.*, at ——, 113 S.Ct. at 2791, 125 L.Ed.2d at 476. Construing Federal Rule of Evidence 702, the Court held that the *Frye* standard—general acceptance of reliability in the relevant scientific community—was superseded by the adoption of the Federal Rules of Evidence, which make all relevant evidence admissible, in general. *Id.* at ——, 113 S.Ct. at 2793, 125 L.Ed.2d at 479.

Thus, the narrow holding of *Daubert* does not affect this case, as the Federal Rules of Evidence are not authoritative in determining admissibility of the DNA evidence in this case. Moreover, although the *Frye* decision of 1923 was not binding on Pennsylvania courts, we nevertheless adopted the *Frye* test as a useful way of evaluating novel scientific evidence under Pennsylvania law. *See, e.g., Commonwealth v. Topa*, 471 Pa. at 231–32, 369 A.2d at 1281–82.

*Daubert* relaxes, somewhat, the impediments to admission of novel scientific evidence. Under *Daubert*, expert scientific testimony is admissible if it fulfills two criteria. First, it must relate to "scientific knowledge," thereby establishing "a standard of evidentiary reliability," which "will be based upon scientific validity." To constitute scientific

Appellant attacks what he characterizes as the trial court's failure to hold a *Frye* hearing, and objects to the court's reliance on judicial decisions from other jurisdictions to establish the scientific community's general acceptance of DNA testing. We note first that the trial court heard two days of testimony from experts in forensic medicine, biochemical genetics, microbiology, and organic chemistry, all qualified as experts in DNA analysis, which might be characterized as a *Frye* hearing. Based on this expert testimony and on the acceptance of DNA evidence in the overwhelming majority of American jurisdictions,[3] the trial court allowed the admission of DNA evidence at appellant's trial. The trial court characterized its decision as one of judicial notice, due to its heavy reliance on acceptance of DNA evidence by other jurisdictions.

The trial court was correct in its review of acceptability of DNA testing in the scientific community and in American

knowledge, the evidence must be grounded in the methods and procedures of science, based on more than subjective belief or unsupported speculation, and supported by appropriate validation based on what is known. The second criterion is that the evidence must be relevant; it must assist the trier of fact to understand the evidence or to determine a fact in issue. *Daubert*, at ——, 113 S.Ct. at 2794–95, 125 L.Ed.2d at 480–81. "General acceptance" will no longer, in federal trials, constitute a threshold necessity in determining admissibility of scientific evidence, though it remains a factor to consider in determining admissibility. Other factors are whether the technique or methodology can be or has been tested: its "falsifiability, or refutability, or testability." Another consideration is whether the theory or technique has been subjected to peer review and publication. A court should also consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation. *Id.* at ——, 113 S.Ct. at 2797, 125 L.Ed.2d at 483.

*Daubert*, interpreting and applying the Federal Rules of Evidence, does not control our analysis of DNA evidence in this case. Whether or not the rationale of *Daubert* will supersede or modify the *Frye* test in Pennsylvania is left to another day.

3. *See* "The Utility of DNA Typing in Forensic Work," *Science*, December 20, 1991 ("By 1990 more than 2000 U.S. court cases in 49 states and the District of Columbia had used DNA tests for such purposes [identification of criminal suspects]," citing U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Forensic DNA Analysis: Issues* (Government Printing Office, Washington, D.C., 1990); U.S. Congress Office of Technology Assessment, *Genetic Witness: Forensic Use of DNA Tests*, OTA–438 (Government Printing Office, Washington, D.C., 1990).

courts of many jurisdictions. It is not necessary to detail here what has been explicated in numerous scientific articles and in many judicial opinions, as well as the expert testimony in the pretrial hearing on DNA in this case. Suffice to say that the scientific processes carried out in a laboratory to compare DNA samples are now routine and fully accepted in the scientific community. Indeed, appellant's DNA expert, Dr. Acton, testified in substance that DNA typing was a generally accepted technique for identity testing. What has not yet achieved universal agreement is the less objective selection of the appropriate population for statistical purposes and the actual statistical analysis which is to be applied to the physical analysis carried out in the laboratory. About the statistical treatment of the physical evidence there remains disagreement and continuing theoretical development.

In short, scientists are almost certain to agree, assuming competent laboratory technique, that two DNA samples do or do not match at a given number of critical loci, called alleles, based on generally accepted physical testing procedures. What is not universally agreed is what conclusions can validly be drawn from the matches observed in the samples.

The relevance of the DNA analysis, in criminal law generally, and in the context of this case, is to establish the identity of the source of a DNA sample discovered at a crime scene. If the DNA sample from the crime scene matches the DNA of an accused, it is at least evidence that the DNA discovered at the crime scene is that of the accused. If the DNA sample matches the DNA of the accused *and no one else*, then it, of course, conclusively establishes that the accused is the source of the DNA found at the scene of the crime. This distinction is expressed in terms of statistical probability of the match occurring randomly in the population. A DNA expert might testify that a given DNA match will occur only once in a population of 10,000,000. Obviously, such a probability makes it highly likely that the DNA samples came from the same source. If the DNA expert's testimony, however, is that a given match might occur coincidentally once in every one hundred samples, then it is far weaker in establishing the

sources of the DNA samples as being one and the same individual.

Thus, in terms of the inferential conclusion to be drawn from DNA evidence in a criminal trial—the accused as source of the DNA sample found at the crime scene—DNA analysis generally can provide only statistical probability; e.g., there is one chance in four hundred or one chance in four million that the DNA sample came from someone else. Conversely, a DNA *mismatch* constitutes conclusive and certain scientific proof that the DNA samples come from different sources. For proving identity, however, as opposed to disproving identity, DNA can never provide absolute, conclusive proof, even though extremely low probabilities of a coincidental match provide a basis for very strong inferences of identity.

The statistical analysis which follows upon physical analysis is subject to variables about which experts may disagree, admitting of several approaches which provide different results. In other words, the same physical analysis, about which all experts agree, might produce from different experts several different numerical conclusions about the statistical probability of a random match. For example, different races and different ethnic groups demonstrate measurably different genetic characteristics. In a given case, then, the statistical probability of a coincidental match will differ depending upon whether the random population includes all human beings or instead is limited to a subpopulation consisting of a given race or a given ethnic group. Depending on the evidence in a case, the statistical population should sometimes be limited to a sample smaller than that of all human beings. This variable factor may account for different conclusions reached by different experts. Similarly, geographical factors also account for different genetic characteristics in various subpopulations. Such variables in a statistical analysis will affect the ultimate conclusions drawn by different experts. Moreover, there exists no single definitive, standard data base of genetic characteristics against which all DNA samples are measured. Instead, different experts compare their samples with the char-

acteristics demonstrated in different data bases, resulting in different numeric conclusions as to statistical probability.

■ These developments in the use of DNA analysis as a forensic tool affect this case as follows. Physical examination of DNA samples in order to identify matches at various alleles is a well-recognized and widely accepted scientific phenomenon, within the meaning of *Frye*. This is evident from the literature, both scientific and jurisprudential, and from the testimony of the DNA experts in this case. We accept the trial court's holding that such evidence is admissible. On the other hand, the record in this case does not support the conclusion that the statistical analysis (applied after the physical testing) has achieved similarly widespread acceptance in the scientific community.[4]

The DNA evidence in this case consisted solely of the former type—testimony regarding the procedure and results of physical testing of the samples. Dr. Deadman, the FBI DNA expert, testified that he found matching profiles at three of four loci, and that the fourth was inconclusive. He stated that with these results, the DNA samples taken from the crime scene were "extremely strongly associated with the DNA from the defendant." He elaborated that in the experience of the entire forensic science laboratory community, he did not know of a single instance "where different individuals that are unrelated have been shown to have matching DNA profiles for three or four probes." The second type of evi-

4. Statistical analysis of DNA evidence remains a major objective of forensic scientists. It may be that the standards for statistical analysis are now sufficiently accepted among experts to satisfy the *Frye* test, and some courts have so held. E.g., *United States v. Jakobetz*, 747 F.Supp. 250 (D.Vt.1990); *Perry v. State*, 586 So.2d 236 (Ala.Ct.Crim.App.1990); *Andrews v. State*, 533 So.2d 841 (Fla.Dist.Ct.App.1988); *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847 (1990); *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989); *Glover v. State*, 787 S.W.2d 544 (Tex.App.1990); *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609 (1990); *State v. Woodall*, 182 W.Va. 15, 385 S.E.2d 253 (1989); *Caldwell v. State*, 260 Ga. 278, 393 S.E.2d 436 (1990); *State v. Pennell*, 584 A.2d 513 (Del.Super.Ct.1989). We hold merely that the record compiled in this case does not include evidence sufficient to satisfy *Frye*, though an exhaustive *Frye* hearing might reach a different result.

dence—conclusions stating numerical probability—was not presented at trial.[5]

As we stated above, it is the conclusions to be drawn from the statistical information accumulated to date regarding DNA matches that has not achieved widespread acceptance within the scientific community. In other words, the meaning of a match between a defendant's DNA and the samples found at a crime scene, in relation to the population at large, is not known. Therefore the trial court properly refused to entertain statistical information regarding the match. The expert, however, was permitted to testify that the match of three out of four loci made it more probable than not that the sperm was that of the defendant. This type of expert opinion testimony does not violate *Frye*, and thus was properly admitted.

Appellant objects to presentation of the physical portion of the analysis without a statistical analysis to sharpen the focus of the evidence, arguing that the physical test results are meaningless without statistical conclusions. We disagree. Admissibility depends on relevance and probative value. *Commonwealth v. Dunkle*, 529 Pa. 168, 177, 602 A.2d 830, 834 (1992). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Spiewak*, 533 Pa. 1, 8, 617 A.2d 696, 699 (1992); *Commonwealth v. Foy*, 531 Pa. 322, 325, 612 A.2d 1349, 1351 (1992). The factual evidence of the physical testing of the DNA samples and the matching alleles, even without statistical conclusions, tended to make appellant's presence more likely than it would have been without the evidence, and was therefore relevant. To be relevant, evidence need not be conclusive. Asked to evaluate the meaningfulness of evidence of a DNA match without an accompanying statement of statis-

5. The conclusion of Dr. Deadman, that the testing suggested a probability of coincidental match as being approximately one in 400, was offered at appellant's preliminary hearing, but not stated at trial, either on direct or cross-examination.

tical probability, appellant's DNA expert likened such testimony to testimony that "I saw a blue Chevrolet run over this dog." Identifying the car as a blue Chevrolet does not specifically identify the offending car, but it is useful, admissible identification evidence. In the same way, the relevant, though inconclusive, DNA evidence was admissible in this case; its weight and persuasiveness were properly matters for the jury to determine.

Appellant's final challenge to the DNA evidence is his assertion that he should have been granted a continuance to conduct his own independent testing of the DNA samples. He alleges that his expert's testing completed after the trial produced "contradictory" results, as the expert found no trace of sperm in the swabs from the victim.

The decision to grant a continuance lies in the sound discretion of the trial judge and will not be disturbed absent an abuse of that discretion. *Commonwealth v. Metzger*, 498 Pa. 678, 682, 450 A.2d 981, 983–84 (1982); *Commonwealth v. DiPasquale*, 431 Pa. 536, 541, 246 A.2d 430, 432 (1968). In reviewing the denial of a continuance, we have regard for the orderly administration of justice as well as the right of a criminal defendant to have adequate time to prepare his defense. *See United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir.1984), *cert. den.* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985); *see also Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140 (1976).

The trial court refused to grant a mid-trial continuance for several reasons. Appellant represented that it would take considerable time to conduct independent analyses of the samples; a lengthy continuance would have exposed the jurors to the publicity surrounding the trial. Ultimately, the defense completed its testing six weeks after receiving the samples, which would have produced a totally inappropriate delay of the trial. When Dr. Acton, the defense expert, completed his testing of the samples, he was unable to obtain conclusive results due to partial degradation of the samples. But, far from excluding appellant, the tests, so far as they went,

corroborated the FBI results. We therefore hold that the trial court properly exercised its discretion in denying appellant's request for continuance.

The next issue is appellant's contention that the Commonwealth's failure to give timely notice of aggravating circumstances denied him a fair trial. Pa.R.Crim.P. Rule 352 requires that, at the time of arraignment, a defendant in a capital case be given written notice of any aggravating circumstances the Commonwealth intends to submit at the sentencing hearing. The Commonwealth failed to give the required notice at the time of appellant's arraignment, doing so only three days before trial. The intent of the rule, as stated in the comment thereto, is "to give the defendant sufficient time and information to prepare for the hearing."

The Commonwealth contends, and the trial court concluded, that appellant was at all times aware of the potential aggravating circumstances, and was not prejudiced in any way by the failure to receive *written* notice of the aggravating circumstances intended to be submitted at the sentencing hearing. At the time of the arraignment, appellant was notified that the Commonwealth would seek the death penalty. The aggravating circumstances submitted in the Hood murder were: perpetration of a felony (robbery), 42 Pa.C.S. § 9711(d)(6), double homicide, § 9711(d)(11), and endangering another, § 9711(d)(7). These aggravating circumstances were inherent in the charges against appellant. The aggravating circumstances submitted in the LaRue murder were: double homicide, § 9711(d)(11), perpetration of a felony (rape), § 9711d(d)(6), and torture, § 9711(d)(8). With the exception of torture, the circumstances were evident from the charges against appellant; torture was submitted to the jury on the basis of evidence that Miss LaRue's hands had been bound before she was killed, evidence apparently not in the possession of the Commonwealth at the time of arraignment.

The trial court reasoned that despite non-compliance with Rule 352, appellant had constructive notice of all aggravating circumstances submitted to the jury, with the possible excep-

tion of torture, and was not prejudiced in any way. As to torture, the Commonwealth cannot and need not provide notice of circumstances unknown to the Commonwealth. Written notice of torture was provided shortly before trial, three weeks prior to the sentencing hearing, and appellant failed to demonstrate any prejudice due to the lack of notice as provided for in Rule 352.

We agree with the analysis of the trial court. Noncompliance with Rule 352 will subject the Commonwealth to appropriate sanctions. What those sanctions might be will depend on the circumstances of each case. In some cases, exclusion of evidence might be appropriate. In others, a continuance might suffice to prevent prejudice to a defendant. In other cases, such as this, no prejudice has resulted from lack of written notice, and even a continuance, denied by the trial court, was found to be unnecessary in the circumstances. We find no error in the court's exercise of its discretion in denying the relief requested by appellant for the Rule 352 violation.

■ Next, appellant argues that a mistrial should have been granted when the chief prosecution investigator, the Commonwealth's primary witness, referred to appellant's post-arrest silence. Appellant cites *Wainwright v. Greenfield,* 474 U.S. 284, 291, 106 S.Ct. 634, 638, 88 L.Ed.2d 623, 632 (1986); *Commonwealth v. Turner,* 499 Pa. 579, 583, 454 A.2d 537, 540 (1982); *Commonwealth v. Easley,* 483 Pa. 337, 396 A.2d 1198 (1979); and *Commonwealth v. Greco,* 465 Pa. 400, 403–04, 350 A.2d 826, 827 (1976), as authority for his alleged entitlement to a new trial. The challenged testimony was given by a police officer who transported appellant back to Pennsylvania after his arrest in West Virginia, who testified as follows:

Q  Did you have occasion, Trooper Howell, to make another trip to the West Virginia area at a point later in time?

A  Yes, I did.

Q  What purpose was that for?

A  Mr. Crews had decided to wave [sic] extradition back to Pennsylvania. Myself, Trooper Link and Trooper Engle went down to transport him back to Pennsylvania.

Q  Did you at that time speak to Mr. Crews?

A  When he was brought out of the cell block, he was taken into a small room. I'm not sure if Trooper Link and Engle were in the room with me or not. I think they were. I read the Miranda rights for him to him. *He told me he didn't want to talk to me until he talked to an attorney.* I then asked him if I just X out the area in the form where it says he's waiving his Constitutional Rights, just to indicate that his rights have been given to him, and he then signed it, the form, David Casey Horn.

(Emphasis added.) This brief exchange, appellant contends, made improper reference to his post-arrest silence in violation of *Commonwealth v. Turner, supra.*

In *Turner,* this court explained its prohibition of reference to an accused's silence:

The view of this Court that there exists a strong disposition on the part of lay jurors to view the exercise of the Fifth Amendment privilege as an admission of guilt is well established. *See Commonwealth v. Singletary,* 478 Pa. 610, 612, 387 A.2d 656, 657 (1978); *Commonwealth v. Greco,* 465 Pa. 400, 404, 350 A.2d 826, 828 (1976); *Commonwealth v. Haideman,* 449 Pa. 367, 371, 296 A.2d 765, 767 (1972). In *Commonwealth v. Haideman, supra,* we stated:

"We would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt." *Walker v. United States* [404 F.2d 900 (5th Cir.1968], . . . It is clear that "[t]he privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." *Slochower v. Board of Higher Ed. of N.Y.* [350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692] [ (1956) ].

*Commonwealth v. Haideman,* 449 Pa. at 371, 296 A.2d at 767 (citations omitted).

*Id.,* 499 Pa. at 582–83, 454 A.2d at 539. The rule against reference to a defendant's post-arrest silence clearly relates to jurors' inferences from such silence. The rationale is that jurors expect an innocent person charged with a crime to deny guilt. Thus the context of a defendant's silence is critical to an analysis of the prejudicial effect of reference thereto.

The challenged testimony concerned the officer's journey to West Virginia to extradite appellant. The concern was whether or not to waive extradition rather than investigation of a crime. Appellant was not under interrogation, and there was no reason whatsoever for him to make any statement relating to the murders of Mr. Hood and Miss LaRue. In short, the context was not one in which jurors would equate invocation of Fifth Amendment rights with an implicit admission of guilt.

The cases cited by appellant involve vastly different factual circumstances. In *Wainwright v. Greenfield, supra,* the defendant had just been arrested for sexual battery, and police officers wanted to question him about the crime. After reading his *Miranda* [6] warnings, they asked him to answer questions, which he declined to do, stating that he wanted to talk to an attorney. The officers' testimony about his response to the *Miranda* warnings was held to violate the defendant's Fifth Amendment rights. In *Commonwealth v. Turner, supra,* the defendant, after testifying that he shot the victim in self-defense, was asked by the prosecutor whether he had ever told the police this exculpatory version of events. As the defendant had never made a statement to the police, his answer would have revealed his silence throughout the time frame when he might have been expected to make an exculpatory statement. Again, this reference to his silence was held to be unconstitutional. Similarly, in *Commonwealth v. Easley, supra,* the defendant testified that the shooting was done in self-defense but that he had not explained the incident to the police, and the trial court permitted the prosecutor to com-

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ment during closing argument, over timely objection, on the defendant's silence, clearly implying that the jury could infer guilt from his protracted silence. This, as in *Turner*, was held to be reversible error. *Commonwealth v. Greco, supra*, involved the testimony of the arresting officer that after being informed of his constitutional rights the defendant did not make any statements; this occurred while the police wanted to question him about the crime for which he was convicted. The court stated that such testimony "necessarily carries the implication that the appellant remained silent and failed to deny his involvement. Such testimony implies an admission of guilt." *Id.*, 465 Pa. at 404, 350 A.2d at 828. Thus, in each of the cases, reference was made to a defendant's silence while under interrogation or investigation for the crime for which he was later convicted under circumstances in which jurors might reasonably expect an innocent person to deny his involvement in the crime. The prejudice to such defendants is obvious. Appellant's situation was entirely different.

Appellant was not faced with an accusation of committing a crime. He was faced with extradition, a procedure not familiar to most citizens, one in which the desire to seek legal counsel would seem reasonable to most people. Anyone facing extradition might want an attorney to explain the procedure, its consequences, and his alternatives, without any regard to the ultimate purpose of the extradition. There could be no inference of guilt because there was no criminal investigation in progress, nor any attempt by the police to solicit a statement from appellant. The implication was totally unlike that in *Turner* and *Easley, supra*, where defendants were asked if they *ever* explained exculpatory circumstances to the police, and were thus charged with failing, over a long period of time, to deny or explain their involvement; here the reference was only to one moment during the extradition process.

Any arguable impropriety in the challenged testimony would also have been harmless error, which we have defined as follows:

An error is harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harm-

less.  An error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict.  Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless.  Thus, "for a reviewing court to conclude that an error is harmless, it must be convinced *beyond a reasonable doubt* that the error did not contribute to the verdict."  The burden of establishing that an error is harmless beyond a reasonable doubt rests with the Commonwealth.

*Commonwealth v. Rush,* 529 Pa. 498, 503–04, 605 A.2d 792, 794 (1992) (citations omitted;  emphasis in original).  Referring to appellant's silence in West Virginia when facing extradition was harmless beyond a reasonable doubt and could not have contributed to the verdict.  The physical evidence against appellant was overwhelming—when arrested, he was wearing clothing of the victims, was carrying their belongings, and had possession of both murder weapons.  Any speculation that a negative inference might have been drawn from his silence during the extradition procedure would be swallowed up in the possibility that jurors might have drawn a negative inference from appellant's failure to testify at his trial.  In standard fashion, appellant's jury was instructed that neither inference was permissible.  The jury charge included the following: "It is entirely up to the defendant in every criminal trial whether or not to testify.  He has an absolute right founded on the Constitution to remain silent.  You must not draw any inference of guilt from the fact that the defendant did not testify."  We are convinced beyond a reasonable doubt that the reference to the West Virginia events did not contribute to the verdict.

▆  Appellant next argues that denial of discovery with respect to another erstwhile suspect, Michael Reese, deprived him of a fair trial.  Appellant learned during pretrial discovery that investigators had drawn blood from Mr. Reese for testing in connection with the investigation of the Hood and LaRue murders.  The trial court denied appellant's request for additional discovery to learn why the police suspected Mr. Reese

enough to conduct a blood test. Appellant bases his argument on the rationale of *Commonwealth v. Redmond,* 395 Pa.Super. 286, 577 A.2d 547 (1990), appeal dismissed, 528 Pa. 601, 600 A.2d 190 (1992). In *Redmond,* the Superior Court affirmed the trial court's ruling that the Commonwealth's failure to disclose the identity of a confidential informant would result in suppression of the testimony of the chief investigator, to whom the informant had given information. This holding was predicated upon Pa.R.Crim.P. 305(B)(1)(a), mandating the disclosure of any Commonwealth "evidence favorable to the accused which is material either to guilt or to punishment. . . ." The unusual facts of the case, involving a murder prosecution 39 years after the killing, based on an investigation reopened after 17 years of inactivity, in which an informant concededly had supplied information on a suspect other than the accused, supported a finding that the identity of the informant was "evidence favorable to the accused."

The *Redmond* holding does not carry the authority of this court, nor does the Superior Court's holding extend to the information requested by appellant in this case. Appellant recognizes as much, but urges extension of the *Redmond* rationale to include "information about who Mr. Reese was and why the police suspected him enough to send his blood to the lab along with that of [appellant]." We decline the opportunity to interpret Rule 305(B)(1)(a) to require disclosure of every fruitless lead followed by investigators of a crime. The mere existence of other suspects is not "evidence favorable to the accused," but is presumably the expectation rather than the exception. Nor does investigative followup of a lead, as by blood comparison, raise a presumption that another suspect's identity is evidence favorable to the accused which is material to guilt or punishment. The trial court properly denied disclosure of the requested information due to appellant's failure to show how disclosure would benefit the defense and how it was material.

Appellant's final argument is that he was entitled to a requested instruction that post-mortem intercourse is not rape; he claims that failure to give the instruction warrants a

new trial. Relying on *Commonwealth v. Sudler,* 496 Pa. 295, 302–03, 436 A.2d 1376, 1379–80 (1981), appellant argues that the absence of evidence of the time of intercourse in the sequence of events surrounding the murders made the requested instruction mandatory.

The trial court need not charge the jury upon the law which has no applicability to the presented facts; there must be some relationship between the evidence presented and the law upon which an instruction is requested. *Commonwealth v. Tervalon,* 463 Pa. 581, 345 A.2d 671 (1975); *Commonwealth v. Santarelli,* 334 Pa.Super. 589, 483 A.2d 895 (1984), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1973, 90 L.Ed.2d 656 (1986). There was absolutely no evidence in the case which tended to prove that intercourse occurred after the victim's death. It was therefore proper for the trial court to refuse the requested instruction.

We now comply with our duty under 42 Pa.C.S. § 9711(h)(3)(iii) to review sentences of death from the standpoint of proportionality to sentences imposed in similar cases. *Commonwealth v. Zettlemoyer,* 500 Pa. at 63, 454 A.2d at 961. We have reviewed the sentence imposed on appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984). There is no excess or disproportionality in the sentence imposed. Further, the record does not provide any basis for belief that the sentence of death was the "product of passion, prejudice or any other arbitrary factor." *See* 42 Pa.C.S. § 9711(h)(3)(i). Accordingly, the sentence must be affirmed.

Judgment of sentence affirmed.[7]

LARSEN and PAPADAKOS, JJ., did not participate in the consideration or decision of this case..

7. The Prothonotary of the Supreme Court is directed to transmit to the Governor the complete record in this case. 42 Pa.C.S. § 9711(i).

McDERMOTT, J., did not participate in the decision of this case.

CAPPY, J., files a concurring opinion.

CAPPY, Justice, concurring.

I join in the opinion offered by the majority, with one exception. I must disassociate myself from that portion of the opinion which approved of the Commonwealth's expert witness offering his personal opinion as to whether or not the semen samples discovered at the crime scene were "probably" those of the defendant. (slip opinion).

In order to illustrate the precise nature of my objection I will briefly discuss the section of the majority opinion dealing with the admissibility of expert testimony on DNA analysis.

The majority concludes that DNA testing is generally accepted in the scientific community and a proper prosecutorial tool. I agree. The majority further concludes that, although the testing procedures have been generally accepted in the scientific community, there is considerable dissension within that community as to interpretation of the results. Everyone can agree on the interpretation of the scientific evidence of exclusion, i.e., which samples do not match. The problem occurs when the samples being examined do match at certain significant markers generally referred to as loci. Therefore, the majority concludes that because there is no general acceptance in the scientific community as to interpreting the results where certain DNA markers match, the trial court properly excluded the proffered testimony of the expert utilizing the statistical evaluation of matching loci under *Frye v. United States,* 293 F. 1013 (D.C.Cir.,1923). I agree.[1]

It is with the majority's final conclusion that I take issue and disassociate myself. Having concluded that a statistical analysis was inadmissible as not having been agreed upon in the general scientific community, the majority goes on to

---

1. For more detailed information regarding the admissibility of DNA testimony see, *Judicature,* Vol 76 No. 5, 1993 "DNA evidence: how reliable?"

analyze the testimony of the expert on the basis of relevancy.[2] The majority concludes that the trial court did not err in permitting the expert to testify that a match was more likely than not under the facts and circumstances of this case. I cannot accept the rationale offered by the majority, nor can I condone the circumvention of *Frye* utilized by the majority. Although the majority found the expert testimony, as to the statistical probability of inclusion, inadmissable under *Frye*, they nevertheless went on to find the testimony admissible under a relevancy standard.

In my view *Frye* requires, as a condition precedent to the admissability of expert testimony, that the scientific basis from which the testimony stems be accepted in the general scientific community. My independent search of the record reveals nothing to indicate that the expert testimony here would have been generally accepted in the scientific community. Equally important, the testimony offered, although couched in verbiage rather than statistics, is nothing more than a casual recitation of a statistical likelihood. In my mind, "more likely than not" means, at minimum, that it is 51 percent likely that there is a match.

Accordingly, the Commonwealth failed to lay a proper foundation with regard to the testimony as admitted into evidence against the defendant. There was no demonstration, as required by *Frye*, that the expert's opinion, that it was more likely than not a match, has gained acceptance in the general scientific community. Lacking that condition precedent this testimony should have been excluded and, therefore, I disassociate myself from the rationale adopted by the majority opinion on this point.

A further review of the record, however, demonstrates that although the admission of this evidence was clearly error, it was harmless error. In light of the overwhelming evidence of

2. The specific testimony by the expert was that since the semen samples found at the crime scene matched the defendant's semen sample at three out of four loci, it was his personal opinion that the sperm at the crime scene was "more probable than not that of the defendant." (Majority opinion at p. 523).

guilt, I am not convinced that the admission of this testimony requires a new trial. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978).

Thus, I join in all other facets of the majority's opinion as well as the result and write only to address specifically the conclusion reached by the majority regarding the application of *Frye* to the facts of this case.