J-A19018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| STEPHIN RILEY, | : | |
| | : | |
| Appellant. | : | No. 1964 EDA 2018 |

Appeal from the Judgment of Sentence Entered, June 5, 2018,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s):  CP-51-CR-0013192-2014.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:               **FILED OCTOBER 21, 2019**

Appellant Stephin Riley appeals from the judgment of sentence imposed

following his conviction of aggravated assault and possession of an instrument

of a crime ("PIC").[1]  We affirm.

On the night of November 3, 2014, Katrina Rumyantseva was attacked

with a rock as she was walking home.  Moments after the attack, Riley was

apprehended by police, and Ms. Rumyantseva made a one-on-one

identification of Riley as the perpetrator.  Riley was arrested and charged with

aggravated assault, PIC, simple assault and recklessly endangering another

person.  Riley filed a motion to suppress all physical and identification

evidence.  The suppression court conducted a hearing, and thereafter denied

---

[1] 18 Pa.C.S.A. §§ 2702(a), 907(a).

---

*   Former Justice specially assigned to the Superior Court.

the motion. Riley also filed a motion *in limine* to preclude DNA evidence, which was denied by the trial court.

The matter proceeded to a non-jury trial. The trial court detailed the relevant trial testimony as follows:

[Ms.] Rumyantseva . . . testified that on November 3, 2014, at around 11 p.m., she was walking home from a Ross store at the Roosevelt Mall when she stopped at an ATM machine near Cottman and Bustleton Avenues right in front of a bus stop. She testified that while there, she noticed a man at the bus stop wearing a gray hoodie that was up and dark[-]bluish pants. There was nobody else out on the street with them at that time. As Ms. Rumyantseva started to walk home from Cottman Avenue along Bustleton Avenue[,] she felt like someone was walking behind her. Ms. Rumyantseva testified that she turned around and saw the man with the gray hoodie that was up walking behind her really close about five to ten feet away. As Ms. Rumyantseva continued to walk home, she testified that she felt something hit her in the back of the head from behind causing her to fall to the ground and she began to scream. Ms. Rumyantseva testified that she looked up and saw the man who was trying to take her bag which she clutched onto. Ms. Rumyantseva testified that the man then started striking her between roughly five to ten times with a hard heavy object which she later identified as a rock. As Ms. Rumyantseva continued to scream and attempt to protect her purse and face, another man, later identified as John Jackmon, came to her aid and the attacker ran away in the direction he came from. Mr. Jackmon testified at trial that when he arrived on the scene he started yelling at the attacker who then started running down Bustleton Avenue. Mr. Jackmon also testified that the attacker was wearing dark clothing and what looked like a hoodie. The ambulance then arrived on the scene and picked up Ms. Rumyantseva.

While Ms. Rumyantseva was in the ambulance receiving medical attention, police officers quickly arrived and presented a man to Ms. Rumyantseva as a suspect in her attack. Ms. Rumyantseva testified that the man was handcuffed and had his hood down when police first showed him to her. At this point, Ms. Rumyantseva was not sure if she could identify him so she requested for the hood to be placed on his head. Once the police

- 2 -

put the hood up, Ms. Rumyantseva was able to positively identify [Riley] as her attacker. Ms. Rumyantseva specifically testified that the difference with the hood up, "she was able to see the features she had seen before." In Ms. Rumyantseva's testimony at both hearings, she described the man who attacked her as 50s-60s in age, average height, dark[-]skinned, facial hair on sides of face by ears, and wearing a gray hoodie that was up and dark[-]bluish pants.

Police Officer Christopher McCue testified at both hearings, that he and his partner Officer Glaviano, received a radio call on the night of November 3, 2014, concerning an attack on the 7800 block of Bustleton Avenue. Officer McCue testified that flash information was given out of a white male, gray hoodie, dark pants that had attempted to assault a female and then fled towards the boulevard on [B]orbeck Street. When the officers arrived at that area a few minutes later, Officer McCue testified that they saw [Riley] standing at a corner bus stop, only a few blocks away from the attack, with a gray hoodie on with the hood up. Officer McCue testified that the officers stopped [Riley], had him put his hands on the police car and frisked him for their safety. That is when Officer McCue noticed [Riley] had blood on his right hand. Also during the time of the stop, [Riley] made a statement to the officer "just kill me now, just kill me now." At that time, Officer McCue put [Riley] in his patrol vehicle, went over police radio, and asked for the complainant to be brought to their location. Officer Ashley Capaldi radioed back to bring [Riley] to their location as the complainant was being worked on by the medics. The officers then took [Riley] to that location at 7800 Bustleton Avenue and walked him in handcuffs to the back of the medic unit. Officer McCue testified that the complainant, Ms. Rumyatseya, initially said that she was unsure if [Riley] was her attacker. Then[,] she asked for [Riley's] hood to be put up[,] and as soon as the hood went up she identified him as the attacker.

At trial, Officer Capaldi testified that she also received a radio call on the night of November 3, 2014, about a female being attacked in the area of Borbeck and Bustleton. When Officer Capaldi and her partner Officer Esquilin arrived at the location, the medic unit was already there with the complainant and she testified that she observed the complainant's head, ear, and hands covered in blood. Officer Capaldi spoke briefly with the complainant to get some information about her attacker and what had occurred. Based on the information she received, she relayed the flash information over police radio and then she and her

partner went to survey the surrounding area. Officer Capaldi testified that she observed [Riley] on Bustleton Avenue in front of a bus stop and Officers McCue and Glaviano were also arriving there at that time. Officer Capaldi and her partner allowed the other officer[s] to stop [Riley] and they returned back to the complainant. After Officer Capaldi and her partner returned to the complainant to check on her, they received a call over the radio to bring the complainant to where [Riley] had been stopped. Officer Capaldi testified that due to the complainant's condition, she requested the officers bring [Riley] to them for identification purposes. When the officers arrived with [Riley], Officer Capaldi testified that they came up into the medic unit to see the complainant.

After treatment by the paramedics, Ms. Rumyantseva was taken to the hospital. Ms. Rumyantseva sustained injuries to the right side of her face and head requiring stitches on her ear and head, and she had a CAT scan of her head. A detective, John Palmiero, came to the hospital to speak with her. Ms. Rumyantseva confirmed to the detective that the man presented to her was her attacker. The detective testified that he also took some photos of Ms. Rumyantseva's injuries and swabs of the blood that was on her right hand to test her DNA. The detective then went to the scene of where the incident happened where he observed a large rock with blood on it that was by the curb. The detective testified that he believed that the rock may have been the one used in the attack on Ms. Rumyanseva. The rock was then taken back to headquarters to process and the blood that was on the rock was swabbed for DNA. Finally, the detective went and saw [Riley] and swabbed the blood on his right hand as well as the blood that was on [Riley's] hooded sweatshirt. He also obtained a swab from the inside cuff of the hooded sweatshirt.

Forensic scientist, Fatimot Adekanmbi, testified as a DNA expert at trial, that the DNA obtained from Ms. Rumyantseva's blood on her right hand excluded [Riley] as a source, the DNA obtained from the blood on the rock was inconclusive, the DNA obtained from [Riley's] blood on his right hand and [his] hooded sweatshirt excluded Ms. Rumyantseva as a source, but the DNA obtained from the inside cuff of [Riley's] hooded sweatshirt, while inconclusive, did not exclude Ms. Rumyantseva as a source. M[s]. Adekanmbi went on to testify that this basically means that the DNA obtained from the inside cuff of [Riley's] hooded sweatshirt has [Riley's] DNA in it and then possibly three other people, with one possibly being Ms. Rumyantseva.

Trial Court Opinion, 10/1/18, at 2-7 (unnecessary capitalization omitted)

Based on the evidence presented, the trial court found Riley guilty aggravated assault and PIC. On June 5, 2018, the trial court sentenced him to five to ten years of imprisonment for aggravated assault, and a concurrent one and one-half to three years of imprisonment for PIC. Riley filed a post-sentence motion which the trial court denied. He then filed a timely notice of appeal. The trial court ordered Riley to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Riley filed a concise statement, and with leave of court, filed a supplemental concise statement. The trial court then filed its Pa.R.A.P. 1925(a) opinion.

Riley raises the following issues for our review:

1. Did not the lower court err by denying [Riley's] motion to suppress identification, where [Riley] was stopped and frisked without reasonable suspicion either that he was the doer of the crime or that he was armed and dangerous, where [Riley] was presented to the victim for identification under grossly suggestive circumstances, and where the Commonwealth did not show that subsequent in-court identifications were untainted by the initial, unconstitutional out-of-court identification?

2. Did not the lower court err and abuse its discretion in denying [Riley's] motion *in limine* to exclude "inconclusive" DNA evidence as irrelevant and prejudicial, where such evidence did not make the existence any salient fact more or less likely?

3. Did not the lower court err in unconstitutionally shifting the burden of proof onto [Riley] by finding him guilty because DNA analysis failed to exculpate or exclude [Riley] as the doer?

4. Did not the lower court err in denying [Riley's] post-sentence motion for a new trial, where the court's verdict, premised only on inferences from improperly admitted and barely probative facts,

was so against the weight of the evidence that it shocks the conscience?

Appellant's Brief at 5-6.  We will address each of his issues in turn.

In his first issue, Riley claims that the trial court erred in denying suppression of physical and identification evidence obtained by police after they subjected him to an investigatory detention without reasonable suspicion.  When we review the ruling of a suppression court:

> we must determine whether the factual findings are supported by the record.  When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.  Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019).  "[A]ppellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress." *Commonwealth v. Bush*, 166 A.3d 1278, 1281-82 (Pa. Super. 2017) (citation omitted).

An individual is lawfully subjected to an investigative detention, or *Terry* stop,[2] when the officer has reasonable suspicion that criminal activity is afoot.

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968) (permitting police to make a temporary, investigatory stop of a suspicious individual in order to determine his identity, or to maintain the status quo momentarily while obtaining more information, if the investigating officers can point to specific and articulable facts which, in conjunction with rational inferences deriving therefrom, reasonably warrant the intrusion).

*See Commonwealth v. Adams*, 205 A.3d 1195, 1203 (Pa. 2019) (holding that an investigative detention is constitutionally permissible if an officer identifies specific and articulable facts that led the officer to believe that criminal activity is afoot, considered in light of the officer's training and experience). "[I]n determining whether the officer acted reasonably . . ., due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id*. (quoting *Terry*, 392 U.S. at 27). While individual facts by themselves may not be enough to establish reasonable suspicion, a collection of those facts taken together may be sufficient to do so. *Commonwealth v. Cook*, 735 A.2d 673, 677 (Pa. 1999). In other words, in order to determine whether the police had reasonable suspicion, we must consider the totality of the circumstances — *i.e.*, "the whole picture." *Commonwealth v. Thomas*, 179 A.3d 77, 83 (Pa. Super. 2018) (citation omitted).

Further, a police officer need not personally observe the suspicious conduct leading to the reasonable belief needed for a *Terry* stop, and may rely upon information received over the police radio to justify the initial stop. *Commonwealth v. Arch*, 654 A.2d 1141, 1144 (Pa. Super. 1995). In such cases, the factors that must be considered in justifying an investigatory stop include the specificity of the description of the suspect in conjunction with how well the suspect fits the given description, the proximity of the crime to the

sighting of the suspect, the time and place of the confrontation, and the nature of the offense reported to have been committed. *Commonwealth v. Jackson*, 519 A.2d 427, 430 (Pa. Super. 1986). Although specificity of description is only one of the factors examined in justifying a stop, it is of great importance in situations where the investigating officers have not personally observed suspicious behavior; the police need to have identification information specific enough to reasonably conclude that the party they are stopping is actually the person for whom they are searching. *Id*. Close spatial and temporal proximity of a suspect to the scene of a crime can also heighten a police officer's reasonable suspicion that a suspect is the perpetrator for whom the police are searching. *Id*. at 431. Moreover, the time and place of an encounter may indicate that a person, conspicuous through their solitary presence at a late hour or desolate location, may be the object of a search. *Id*.

Riley initially argues that the trial court erred by denying suppression because (1) the description which led police officers to stop him was too generic to support a stop; and (2) he did not match the generic description that police had been given. According to Riley, the description of the perpetrator provided to the responding officers in the police radio call was a "white male wearing a gray hoodie, dark pants, dark shoes." Appellant's Brief

at 19 (quoting N.T. Trial, 4/5/18, at 87).[3]  Riley argues that "[t]he information was totally devoid of any details about height, weight, build, age, hairstyle, facial hair or lack thereof, or any characteristic beyond a generic account of the doer's clothing."  *Id*. at 19-20.  In Riley's view, the information provided to police was insufficient to support a *Terry* stop.  Riley further contends that he did not match the description provided to police, noting that Officer McCue testified that Riley is not a white male, but is "black" or "African American."  *Id*. at 20 (quoting N.T. Suppression, 5/15/17, at 44-45).[4]

Riley relies on *Jackson*, where police responded to a burglary in progress, and were told by the complainant that "one of the perpetrators, a

---

[3] As noted above, when reviewing a claim of suppression court error, our review is limited to the suppression court record.  We may not consider testimony or evidence outside the suppression court record, such as the trial testimony quoted by Riley.  *See Bush*, 166 A.3d at 1281-82.

[4] Riley additionally claims that, after police stopped him, he should not have been frisked because there is no indication in the record that police saw a bulge in his pocket or any other sign that he was armed and dangerous.  *See Commonwealth v. Mathis*, 173 A.3d 699, 722 n.9 (Pa. 2017) (noting that, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous).  Accordingly to Riley, since the frisk was not justified, the evidence which flowed from the frisk, including the observance of blood on his hand and his statement to police to "just f**king kill me now," should have been suppressed.  Appellant's Brief at 21.  Riley did not raise this issue at the suppression hearing.  *See* Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived and cannot be raised for the first time on appeal).  Nor did he raise it in his concise statement.  *See Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) (holding that if an appellant is directed to file a concise statement of matters to be raised on appeal pursuant to Pa.R.A.P. 1925(b), any issues not raised in that statement are waived).  Therefore, the issue is waived.

black male wearing a gray sweatsuit, ran east on Vine St." *Jackson*, 519 A.2d at 440. The appellant was spotted within several minutes, and within a few blocks of the crime. He matched the description supplied by the complainant in that he was a black male wearing a gray sweatsuit, and also in that he was running, albeit towards rather than away from the scene of the crime. Notably, the *Jackson* Court ruled that, while the investigating officers had insufficient information to conclude that appellant was the perpetrator of the crime, they were nevertheless justified in conducting an investigative detention. *Id*. at 442. Indeed, the *Jackson* Court stated, "[i]n light of appellant's proximity and conformance with the limited description, the police acted diligently in stopping him." *Id*. at 441.

The facts of this case are similar to those presented in *Jackson*. Here, Officer McCue testified at the suppression hearing that, on the evening of November 3, 2014, around 11:00 p.m., flash information was provided via a police radio call that "a white male, gray hoodie, dark pants[,] had attempted to assault [a] female and then fled towards the boulevard [via] Borbeck Street." N.T. Suppression, 5/15/17, at 37. The officer and his partner surveyed the area. *Id*. Two to three minutes after the radio call, the officers saw Riley and two other individuals standing at a bus stop on the corner of the 7700 block of Roosevelt Boulevard, which was approximately three blocks away from the scene of the attack. *Id*. at 39, 40, 43. Riley was wearing a

- 10 -

gray hoodie with the hood up, and dark pants. *Id*. at 38, 41, 42. The other two individuals at the bus stop did not match the flash description. *Id*. at 40.

The suppression court determined that the police officers were justified in stopping Riley, and explained the rationale for its suppression ruling as follows:

> Here, the police officers arrived at the area a few minutes after the incident occurred and saw [Riley] standing at a corner bus stop, only a few blocks away from the attack, wearing a gray hoodie with the hood up, matching the flash information that they had received.

Trial Court Opinion, 10/1/18, at 8.

The suppression court's ruling is supported by the record. Riley fit the description of the perpetrator in that he was wearing a gray hoodie and dark pants. He was also located in close proximity to the crime scene, and within minutes of the attack. Riley was also found on Roosevelt Boulevard, which was the direction toward which the suspect was seen running, per the radio call. Additionally, the officers observed only two other individuals in the vicinity at that late hour, and neither of those individuals matched the flash description provided in the radio call.

While the flash description was for a white male, and Riley is black, this is but one of many factors to consider when viewing "the whole picture."[5]

---

[5] Moreover, given that Riley was wearing a sweatshirt with the hood up, pants, and sneakers at the time of the attack, which occurred late at night, very little of his skin would have been visible.

- 11 -

*Thomas*, 179 A.3d at 83. As in *Jackson*, while the investigating officers had insufficient information to conclude that Riley was the perpetrator of the attack on Ms. Rumyantseva, they were nevertheless justified in conducting an investigative detention, given Riley's temporal and physical proximity to the crime scene and conformance with the limited description of the clothing that the attacker was wearing. *Jackson*, 519 A.2d at 441-42. Thus, in light of the totality of the circumstances, we conclude that the record supports the suppression court's ruling that the officers had reasonable suspicion to conduct an investigative detention of Riley. Accordingly, this aspect of Riley's first issue warrants no relief.

Next, Riley argues that the suppression court erred in denying his motion to suppress Ms. Rumyantseva's one-on-one, out-of-court identification of him as the perpetrator. Riley asserts that the out-of-court identification procedure was unduly suggestive because he was the only person presented to Ms. Rumyantseva on the night of the attack, he was presented to her while he was in handcuffs and flanked by two police officers, and police commented that he was "covered in blood." Appellant's Brief at 23. Riley further contends that, when Ms. Rumyantseva expressed uncertainty as to whether he was her assailant, police raised the hood of his sweatshirt over his head, further obscuring his features, to obtain the victim's identification of Riley as the perpetrator. *Id*.

While one-on-one confrontations are generally condemned, those which occur soon after the commission of crime are permissible if, indeed, not favored. ***Commonwealth v. Allen***, 429 A.2d 1113, 1121 (Pa. Super. 1981). In reviewing the propriety of one-on-one identification evidence:

> the central inquiry is whether, under the totality of the circumstances, the identification was reliable. The purpose of a "one[-]on[-]one" identification is to enhance reliability by reducing the time elapsed after the commission of the crime. Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors. As this Court has explained, the following factors are to be considered in determining the propriety of admitting identification evidence: the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. The corrupting effect of the suggestive identification, if any, must be weighed against these factors. Absent some special element of unfairness, a prompt "one[-]on[-]one" identification is not so suggestive as to give rise to an irreparable likelihood of misidentification.

***Commonwealth v. Moye***, 836 A.2d 973, 976 (Pa. Super. 2003).

Importantly, this Court has ruled that "on-scene, one-on-one identifications, even where an appellant is handcuffed and officers ask a victim to identify him as the perpetrator, are 'not so suggestive as to give rise to an irreparable likelihood of misidentification.'" ***Id***. (citing cases); ***see also id***. at 977-78 (affirming conviction based on victim's one-on-one, crime-scene identification of appellant viewed alone in police van, wearing handcuffs, where police said they had someone for her to identify and that they had found him running down the street all sweaty and just tired-looking);

*Commonwealth v. Hale*, 85 A.3d 570, 574-75 (Pa. Super. 2014) (where victim had a sufficient opportunity to view appellant during the five minutes he was in her apartment, and the period between the crime and her identification was brief, denial of suppression affirmed even though appellant was handcuffed and police asked victim to identify appellant as the perpetrator); *Commonwealth v. Armstrong*, 74 A.3d 228, 239 (Pa. Super. 2013) (affirming conviction where, in less than ten minutes after the attempted break-in, police drove the victim to see someone they had picked up "running" through the apartment complex, appellant was shown to the victim while in handcuffs, and the officers told the victim that "they wanted [her] to . . . identify him as the same guy that was trying to break into [her] apartment").

Here, Ms. Rumyantseva testified that she first noticed Riley at a bus stop eight to ten feet away from her as she stopped at an ATM while walking home. N.T. Suppression, 5/15/17, at 10. When she continued walking, she crossed the street, and then noticed that someone was following her. *Id*. at 19. She turned around and observed that it was the same individual, and that he was only eight to ten feet behind her. *Id*. at 11. She described him as wearing a gray sweatshirt with the hood up, and dark blue pants. *Id*. at 14. The victim also indicated that there were street lights in the area. *Id*. at 16. Approximately a minute later, she was attacked from behind. *Id*. at 21. The police brought Riley to the victim within five to ten minutes of the assault. *Id*.

at 15. By that time, she was in an ambulance being treated by medics. *Id*. at 14. When the officers asked her if she recognized Riley, his hood was down on his shoulders. *Id*. She initially stated "I don't know, yes, no." *Id*. at 15. However, at her request, police pulled the hood of the sweatshirt up over Riley's head.[6] *Id*. at 38. At that point, Ms. Rumyantseva was "[a] hundred percent" certain that Riley was her attacker. *Id*. at 15.

The totality of the circumstances surrounding Ms. Rumyantseva's identification, particularly the promptness with which it was completed, supports the suppression court's determination that Ms. Rumyantseva's out-of-court identification was reliable and not unduly suggestive. Ms. Rumyantseva had sufficient time to view her attacker while she was at the ATM, and, more specifically, when she turned around to see who was following her. Riley fit the description of the attacker, as provided to police, in that he was wearing a gray sweatshirt and dark pants. The identification was made within five to ten minutes of the attack, and, once Riley's hood was raised over his head, the victim was "a hundred percent" certain that Riley was her attacker.

---

[6] At the suppression hearing, Ms. Rumyantseva's testimony was silent as to who or what prompted the police to raise the hood of the sweatshirt over Riley's head. N.T. Suppression, 5/15/17, at 15, 30-31. However, Officer McCue testified that Ms. Rumyantseva requested that police lift the hood of Riley's sweatshirt over his head. *Id*. at 38. Thus, the suppression record supports the suppression court's determination that the hood of Riley's sweatshirt was raised over his head at Ms. Rumyantseva's request.

Further, no evidence presented at the suppression hearing indicated the presence of special elements of unfairness that would have given rise to an irreparable likelihood of misidentification by Ms. Rumyantseva. That Riley was handcuffed, in the presence of police, and that the police asked the victim if he was her attacker, are not elements so suggestive as to give rise to an irreparable likelihood of misidentification. **See Moye**, 836 A.2d at 976. Further, any corrupting effect of the hood being placed on Riley's head is outweighed by other indicia of reliability.[7] **See id**. (holding that the corrupting effect of the suggestive identification, if any, must be weighed against the other factors). Finding no special element of unfairness, we conclude that the suppression court did not err in denying Riley's motion to suppress the out-of-court identification evidence.[8]

In his second issue, Riley claims the trial court erred in denying his motion *in limine* to exclude inconclusive DNA evidence. In evaluating the denial or grant of a motion *in limine,* our standard of review is well-settled:

---

[7] Riley also argues that the police officer's comment to Ms. Rumyantseva that "there was blood on him or he was covered in blood," **see** N.T. Suppression, 5/15/17, at 32, provides further support that the identification procedure was unduly suggestive. However, it is unclear from the record when this comment was made. Indeed, the record suggests that this comment was made **after** Ms. Rumyantseva identified Riley as the perpetrator. **See id**. at 30. Thus, we do not consider it in our analysis.

[8] Since we find that the out-of-court identification was not unduly suggestive, it is not necessary to determine whether Ms. Rumyantseva's subsequent in-court identification had an independent basis.

> When ruling on a trial court's decision to grant or deny a motion *in limine,* we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Moser*, 999 A.2d 602, 605 (Pa. Super. 2010) (citation omitted).

Only relevant evidence is admissible at trial. Pa.R.E. 402. Evidence is relevant if it tends to make a material fact more or less probable than it would be without the evidence. *Id*., 401. To be relevant and admissible, "evidence need not be conclusive." *Commonwealth v. Crews*, 640 A.2d 395, 402 (Pa. 1994). Even if relevant, however, evidence may be excluded "if its probative value is outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Evidence is not unfairly prejudicial simply because it is harmful to the defendant's case. *See Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa. Super. 2009). The trial court is not required to "sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand." *Id*. (citation omitted). Rather, exclusion of evidence on this ground "is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Id*. (citation omitted).

Riley contends that the trial court abused its discretion by admitting irrelevant DNA evidence of blood found on Riley's sweatshirt sleeve and the rock which was inconclusive and "extremely complex." Appellant's Brief at 25. He argues that the analysis of the DNA samples recovered did not make it any more or less likely that he was Ms. Rumyantseva's attacker since (1) none of the samples taken from Ms. Rumyantseva or the rock showed the presence of Riley's DNA; and (2) none of the DNA samples recovered from Riley or his clothing showed Ms. Rumyantseva's DNA. Riley additionally claims that the Commonwealth's expert, Ms. Adekanmbi, did not state that the DNA found on Riley's sleeve was "extremely strongly associated" with Ms. Rumyantseva, or that it was "more likely than not" that she was the source of the DNA or that she and Riley had ever interacted. *Id*. at 27-28. According to Riley, the DNA evidence did not bear on the identity of the attacker, and any possible probative it had was outweighed by the danger of unfair prejudice, confusion, and misdirection of the fact-finder.

Riley attempts to distinguish this case from **Crews**, **supra**, where our Supreme Court determined that certain DNA evidence, although inconclusive, was nevertheless relevant and admissible. It ruled as follows:

> The factual evidence of the physical testing of the DNA samples and the matching alleles, even without statistical conclusions, tended to make appellant's presence more likely than it would have been without the evidence, and was therefore relevant. To be relevant, evidence need not be conclusive. Asked to evaluate the meaningfulness of evidence of a DNA match without an accompanying statement of statistical probability, appellant's DNA expert likened such testimony to testimony that "I saw a blue

Chevrolet run over this dog." Identifying the car as a blue Chevrolet does not specifically identify the offending car, but it is useful, admissible identification evidence. In the same way, the relevant, though inconclusive, DNA evidence was admissible in this case; its weight and persuasiveness were properly matters for the jury to determine.

*Crews*, 640 A.2d at 402-03 (internal citations and some quotation marks omitted).

In applying the *Crews* rationale to the present case, the trial court concluded that the DNA evidence, though inconclusive, was relevant and admissible to the issue of whether Riley was Ms. Rumyantseva's attacker, and that it was for the fact-finder to determine its weight. Trial Court Opinion, 10/1/18, at 10-11.

We discern no abuse of discretion by the trial court in admitting the DNA evidence. The DNA evidence tended to support an inference that Riley committed the crime because it showed a scientific possibility that Riley could be the perpetrator. Specifically, the blood obtained from the inside cuff of Riley's sweatshirt had Riley's DNA in it and possibly the DNA of three other people, with one possibly being Ms. Rumyantseva. While the DNA evidence was inconclusive, it was for the trial court, sitting as fact-finder, to determine its weight and persuasiveness. *See Crews*, 640 A.2d at 403. Thus, Riley's second issue warrants no relief.

In his third issue, Riley claims that, "after listening to a day of complex, technical, confusing, and ultimately irrelevant testimony regarding DNA analysis, the trial court immediately found Mr. Riley guilty and made a factual

finding that 'the blood results [sic], though inconclusive, do not specifically exclude [Riley]." Appellant's Brief at 30 (quoting N.T. Trial, 4/6/18, at 76-77). He argues that it was not his burden to show that the evidence excluded him as the perpetrator, and that, in making this factual finding, the trial court improperly shifted the burden of proof to Riley to show that the DNA evidence excluded him.[9]

Riley's claims are belied by the record. First, contrary to Riley's suggestion otherwise, the trial in this matter took place over the course of two days, and consisted of numerous witnesses and exhibits. Second, the trial judge, sitting as fact-finder, did not base her verdict of guilt **solely** on the fact that the DNA evidence did not exclude Riley as the perpetrator. Rather, the trial judge arrived at her verdict after she "reviewed **all** of the evidence presented as well as the notes that [she] took during the trial." N.T. Trial, 4/6/18, at 76 (emphasis added). Additionally, the trial judge specifically acknowledged that the DNA evidence was not conclusive, and explained that such evidence was merely one of many factors that informed her decision:

> Based on the evidence that has been presented, I do find that Mr. Riley is guilty of the aggravated assault and the possession of an

---

[9] We observe that, under our appellate rules, the parties' briefs must include a discussion of each question raised on appeal and a "citation of authorities as are deemed pertinent." **See** Pa.R.A.P. 2119(a); **see also Commonwealth v. Heggins**, 809 A,2d 908, 912 n.2 (Pa. Super. 2002) (holding that an issue identified on appeal but not developed in appellant's brief of abandoned and therefore waived). In his brief, Riley fails to cite to, let alone discuss, any controlling case law or relevant authority which support his claim. While we could find waiver on this basis, we decline to do so.

instrument of crime. My findings include the fact that the blood results, though inconclusive, do not specifically exclude the defendant. The clothing descriptions of the witnesses were the best descriptions, and they were consistent. I also considered the length of time that it took for apprehension of the defendant and the close proximity to the scene of the crime.

*Id*. at 76-77.

Importantly, the trial court sitting as trier of fact is presumed to know the law and correctly apply the burden of proof. *See Commonwealth v. Smith*, 97 A.3d 782, 789 (Pa. Super. 2014). Based on the record before us, Riley has failed to overcome that presumption. Thus, Riley's third claim merits no relief.

In his final issue, Riley contends that the verdict of guilty was against the weight of the evidence. Our standard of review of a challenge to the weight of the evidence is well-settled:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (internal citations omitted). "[I]t is for the fact-finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony." *Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa.

- 21 -

Super. 2009) (citations omitted). This Court may not substitute its judgment for that of the fact-finder as to credibility issues or the weight to be given to evidence. *Commonwealth v. Furness*, 153 A.3d 397, 404 (Pa. Super. 2016). This standard applies even when the trial judge rendered the verdict at issue as the finder of fact. *See*, *e.g.*, *Commonwealth v. Konias*, 136 A.3d 1014, 1023 (Pa. Super. 2016) (applying the above standards to a weight challenge following a bench trial).

Further, a challenge to the weight of the evidence concedes that sufficient evidence supports the verdict. *Widmer*, 744 A.2d at 751. Thus, to allow an appellant "to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2016) (internal citation omitted).

Riley claims the verdict must be overturned because it was so against the weight of the evidence that it shocks one's conscience. Riley argues that the trial court did not find that Ms. Rumyantseva's identification of Riley was credible, or address her initial uncertainty, or that she appeared to identify Riley as her assailant primarily based on the hood of his sweatshirt. Appellant's Brief at 32. Riley further claims that the trial court did not address the fact that Riley is black, while initial descriptions of the perpetrator indicated that he was white or Hispanic. *Id*.

In making his weight argument, Riley essentially asks this Court to make different credibility determinations and weigh the evidence in his favor. This we cannot do. We are bound by the trial court determination that the testimony of Ms. Rumyantseva, the police officers, and the other witnesses was credible. *See* Trial Court Opinion, 10/1/18, at 12.

Additionally, the trial court offered the following explanation for its determination that the verdict was not against the weight of the evidence:

> [T]he verdicts in this case were supported by ample evidence at trial. [Riley] was identified as matching the radio flash that police received, based off the information given by Ms. Rumyantseva, at a location approximately three blocks away from the complainant's location. The police officers testified to reaching the area of the call within a few minutes. The officers located [Riley] within a few minutes of receiving the call and surveying the area. The officers made this identification of [Riley] based off of the gray hoodie and dark pants that he was wearing. [Riley] also had blood on his right hand. When [Riley] was brought to Ms. Rumyantseva, she was able to immediately identify [Riley] as her attacker after his hood was put up by the officers. The DNA evidence, while inconclusive, could not specifically exclude Ms. Rumyantseva's DNA from being the one found on the inside cuff of [Riley's] hooded sweatshirt. Therefore, based on these reasons, the [c]ourt denied [Riley's] post[-]sentence motion requesting a new trial because the verdict was in no way against the weight of the evidence nor against the interest of justice.

Trial Court Opinion, 10/1/18, at 13-14 (formatting altered).

We find no abuse of discretion in the trial court's determination. Our review discloses that Ms. Rumyantseva was subject to extensive cross-examination regarding her initial uncertainty that Riley was her assailant. *See* N.T. Trial, 4/5/18, at 62-63. Ms. Rumyantseva was also cross-examined regarding the color of Riley's skin, and she explained that, on the night of the

attack, she observed that Riley was dark-skinned. *See id*. at 52, 60. Thus, the trial court had a full opportunity to observe her testimony and to assess the credibility of her explanations. After reviewing all the evidence, the trial court found that the credible evidence identified Riley as Ms. Rumyantseva's attacker. As we discern no abuse of discretion by the trial court in determining that its verdict was not so contrary to the evidence as to shock the conscience, Riley's final issue warrants no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/19